

# NUMBER 13-23-00040-CV

# COURT OF APPEALS

# THIRTEENTH DISTRICT OF TEXAS

# CORPUS CHRISTI – EDINBURG

## IN THE INTEREST OF A.C.T.M., A CHILD

### On appeal from the 430th District Court of Hidalgo County, Texas.

## MEMORANDUM OPINION ON REMAND

**Before Justices Benavides, Longoria, and Tijerina**
**Memorandum Opinion on Remand by Justice Longoria**

Appellant M.M. appeals the termination of her parent-child relationship with her daughter, A.C.T.M.,[1] following suit brought by appellee the Texas Department of Family and Protective Services (the Department). On June 15, 2023, this Court dismissed this appeal for lack of jurisdiction. *See In re A.C.T.M.*, No. 13-22-00517-CV, 2023 WL 4013579, at *1–4 (Tex. App.—Corpus Christi–Edinburg Jan. 5, 2023, pet. granted), *rev'd*

---

[1] We refer to appellant and her child by initials to protect their privacy. *See* TEX. R. APP. P. 9.8(b).

___ S.W.3d ___, 2023 WL 9007803 (Tex. 2023). The Supreme Court of Texas reversed our dismissal and remanded the case back to this Court to address the merits of M.M.'s issues. *See In re A.C.T.M.*, ___ S.W.3d ___, 2023 WL 9007803 at *8. By five issues, which we reorganize and interpret as two, M.M. argues that (1) the evidence was legally and factually insufficient to support the trial court's grounds for terminating her parental rights and its finding that termination was in A.C.T.M.'s best interest; and (2) her rights under the U.S. Constitution and Texas Constitution were violated. We affirm.

## I. BACKGROUND

M.M. gave birth to A.C.T.M. on January 1, 2017. On January 1, 2020, the Department received a "report for physical neglect and physical abuse of a [three]-year-old child said to be extremely malnourished." The report noted that A.C.T.M. weighed thirteen pounds.

On January 7, 2020, the Department filed its "Original Petition for Protection of a Child, for Conservatorship, and for Termination in Suit Affecting the Parent-Child Relationship." In its petition, the Department sought emergency temporary managing conservatorship of A.C.T.M., alleging that there was an immediate danger to the physical health or safety to A.C.T.M. and that remaining in the home would be contrary to her welfare. The Department also sought to terminate the parent-child relationship between M.M. and A.C.T.M. and be appointed as A.C.T.M.'s permanent managing conservator in the event that reunification could not be achieved. *See* TEX. FAM. CODE ANN. § 161.001.[2]

---

[2] The petition also sought termination of the parent-child relationship between A.R.R.—the alleged father—and A.C.T.M., and any potential parent-child relationship between "Unknown Father" and A.C.T.M., in the event that reunification could not be achieved.

2

In support of its petition, the Department attached affidavits by its childcare investigator Myranda Cerda and special investigator Ramiro Avila.

Cerda's affidavit alleged that she observed A.C.T.M. while she was treated at Edinburg Children's Hospital (ECH) on January 1, 2020, and that she appeared to be severely malnourished, emaciated, and had "little to no muscle mass." Cerda also alleged she observed the skin on A.C.T.M.'s legs to be dark brown and flaky, and that A.C.T.M. had bruises on her forehead. According to Avila's affidavit, while at the hospital, M.M. told Avila that M.M. had paid a "coyote"[3] $4,000.00 to cross her and A.C.T.M. into the United States, and that the pair had crossed the river via raft the night before on December 31, 2019. In addition, M.M. indicated that she had taken A.C.T.M. to the hospital on the morning of January 1, 2020 because A.C.T.M. was nonresponsive and not breathing well. Avila's affidavit noted that M.M.had been unable to explain "why [A.C.T.M.] was in such a malnourished condition."

On January 7, 2020, in an emergency order, an associate judge appointed the Department as A.C.T.M.'s temporary managing conservator. *See id.* § 201.005 (authorizing a judge of a court to refer a suit under Title 5 to an associate judge). An adversary hearing was conducted on January 15, 2020. On February 4, 2020, the associate judge rendered its temporary order continuing the Department's appointment as managing conservator of A.C.T.M., ordering M.M. to comply with a service plan, and providing M.M. temporary visitation with A.C.T.M. The court-ordered service plan required M.M. to: (1) complete a psychosocial evaluation; (2) attend individual counseling;

---

[3] In a bench trial, Avila explained that coyotes are "people paid by citizens of Mexico to smuggle them into the [U.S.]" and that "there is no insurance or guarantees they won't get caught."

3

(3) complete a parenting course; (4) complete a drug and alcohol dependency assessment; (5) submit to drug testing; (6) complete a substance abuse treatment program; (7) comply with her service plan; (8) pay child support; and (9) pay health insurance.

The associate judge rendered a subsequent order signed on March 3, 2020, which continued the Department's appointment as temporary managing conservator. The Department filed its "First Amended Petition for Protection of a Child, for Conservatorship, and for Termination in Suit Affecting the Parent-Child Relationship" on May 26, 2020, and its "Second Amended Petition for Protection of a Child, for Conservatorship, and for Termination in Suit Affecting the Parent-Child Relationship" on July 1, 2020. On July 2, 2020, the associate judge issued an additional order continuing the Department's appointment as temporary managing conservator.

On March 30, 2021, the case proceeded to a bench trial, which was conducted remotely via video-conference over the course of fifteen days throughout 2021 and 2022. The following witnesses testified at the bench trial: Avila, Cerda, Sarah Garza, Dr. Bibek Raj Bista, M.M., and Victoria Guerra.

## II. BENCH TRIAL

### A. Avila

Avila testified that the Department received an intake report for physical neglect of A.C.T.M. on January 1, 2020. Avila and Cerda arrived at ECH at 4:25 p.m. Avila stated he observed A.C.T.M. in the intensive care unit and he spoke to medical staff and M.M. According to Avila, A.C.T.M. was transferred to ECH from McAllen Medical Center

4

(MMC), and had arrived severely malnourished. Avila stated that A.C.T.M. had suffered a cardiac arrest at MMC, and that she was three years old and weighed fourteen pounds. Avila stated that "[y]ou could see her bones in her rib cage, her arms, and her legs." Avila observed that A.C.T.M. was "unconscious, or maybe sleeping" and was treated by the hospital for malnourishment with a breathing apparatus and antibiotics. The trial court admitted several photos which depicted A.C.T.M.'s skeletal appearance at the hospital on January 1, 2020 through Avila's testimony.

Avila testified that A.C.T.M. had a bruise to the right side of her forehead. According to Avila, investigators were unable to verify M.M.'s claim that A.C.T.M. had injured herself by falling on a sidewalk in Mexico as it had occurred in another country. Avila also testified that A.C.T.M. had a bruise on her left inner thigh. When asked about the thigh bruise, M.M. stated she did not know how this occurred but indictated that A.C.T.M. had been in the care of Eric Sandoval, M.M.'s boyfriend, in Mexico and that he might have had something to do with the bruise. Avila could not verify this information because it occurred in Mexico and Sandoval was not available for contact as there was no location information provided.

Avila testified that M.M. had stated that she and A.C.T.M. had recently been smuggled across the Mexico-United States border "by some coyotes" and had arrived in McAllen on the same date. According to Avila, investigators were unable to verify M.M.'s story as to how she and A.C.T.M. arrived in the United States. However, Avila testified that M.M.'s stepmother indicated she gave M.M. $4,000.00 to pay the coyotes, but he could not confirm that the money was given to any smuggler.

5

Avila testified that, according to M.M., she and A.C.T.M. arrived in the McAllen home of M.M.'s father and stepmother on December 31, 2019, at about 8 or 9 in the evening after crossing into the United States. M.M. stated that she and A.C.T.M. conversed with family and then fell asleep. M.M. indicated that A.C.T.M. was "fine, walking around" in the home and "was hitting a pi[ñ]ata" that had been purchased for A.C.T.M.'s birthday. Avila confirmed that M.M. was at the McAllen home after speaking to her father and stepmother. Avila also confirmed there was a piñata at the home but indicated that no photographs were presented to him of the evening in question.

Avila testified that M.M. had brought A.C.T.M. to the hospital because she was having a hard time breathing. M.M. told Avila that she and her stepmother "tried to resuscitate [A.C.T.M.] with alcohol and water and that didn't work. So they decided to bring her to the emergency room, McAllen [M]edical." M.M. stated she had no idea how A.C.T.M. got in her condition and only indicated that A.C.T.M. "ate very, very little," "did not eat very well," and that M.M. "g[ave] [A.C.T.M.] vitamins to try to keep her healthy."

Avila also testified that M.M. explained that, prior to being smuggled into the U.S., she and A.C.T.M. lived with Sandoval at an apartment in Mexico and that she worked by selling food plates.

**B.    Cerda**

Cerda testified that she and Avila went to ECH on January 1, 2020, in the late afternoon. At ECH, Cerda observed that A.C.T.M. was severely malnourished, emaciated, and weighed about thirteen pounds. Cerda testified that when she first saw A.C.T.M., "she had a yellow, bluish, greenish bruise across the top of her forehead. And

6

then, her legs were also discolored, and her skin was flaky. Of course, you could see her bones. They were protruding." Cerda also observed that A.C.T.M. had half-crescent moon marks on the inside of her thigh, which Cerda testified was indicative of a mark caused by a belt buckle. The trial court admitted several photos which depicted A.C.T.M.'s injuries as observed at the hospital on January 1, 2020 through Cerda's testimony.

Cerda testified that she and Avila spoke to M.M., who stated that she and A.C.T.M. had crossed the border into the United States from Mexico on December 31, 2019, by raft and assisted by smugglers. When Cerda asked about A.C.T.M.'s state of malnourishment, M.M. stated it had occurred in Mexico in a time period when M.M. and A.C.T.M. had to wait before they could come in the United States. Specifically, according to Cerda, M.M. stated that she and A.C.T.M. had stayed at a camp close to the border and that A.C.T.M. had no issues the day before her hospitalization, that she ate and was able to walk. M.M. also admitted to smoking marijuana in the presence of A.C.T.M. the day before they crossed into the United States while under the care of the smugglers.

Regarding the bruising on A.C.T.M.'s inner thigh, M.M. informed Cerda that the mark was done by Sandoval and that he would often hit A.C.T.M. with a belt buckle. M.M. also stated that Sandoval would hit her and A.C.T.M. several times, that she had been in the relationship with him for a couple of months, and that he was abusive. Nonetheless, M.M. admitted that she would leave A.C.T.M. alone with Sandoval when she sold food plates. M.M. indicated that the last time she had taken A.C.T.M. to a doctor was about seven or eight months prior to January 1, 2020, which would have been approximately April of 2019.

7

**C.  Sarah Amanda Garza**

Sarah Amanda Garza, a conservatorship specialist with the Department, testified regarding the initial reports received and subsequent developments. Garza testified that the Department's initial goal was family reunification but soon changed to unrelated adoption because A.C.T.M. nearly died, M.M. was not able to consistently provide answers as to how or why A.C.T.M. was in the condition she was in, and "there were a lot of concerns from the beginning, and that continued through the case." Garza further explained that M.M.'s father and stepmother were considered for placement but "that was an unfavorable home study." M.M. did not provide—and the Department was unable to contact—any other family members.

Garza had a face-to-face interview with M.M. at the hospital on January 15, 2020, the date of the adversary hearing. During the interview, M.M. provided an explanation as to A.C.T.M.'s malnourished condition. In particular, Garza noted the inconsistencies of the information M.M. provided:

> So, in the beginning, I had asked [M.M.] to, you know, describe what [A.C.T.M.] eats and when [A.C.T.M.] stopped eating. And [M.M.] said that [A.C.T.M.] stopped eating approximately two months before they crossed. But then, [M.M.] stated that it was during the time that . . . [A.C.T.M.] was being physically abused by Mr. Sandoval, which would have been before that timeframe.
>
> So, [M.M.] said that—that's when [A.C.T.M.] stopped really eating, that she had less of an appetite. It wasn't significant, but that she was eating less. And then, [M.M.] said that they went to this pueblo that they were at before they were going to cross, and they were there for a couple of months.
>
> And [M.M.] said that they ate every day, something. I asked [M.M.] to describe to me what she ate, and she described tacos sometimes or, you know, egg. You know, different examples for breakfast. And then, she later on said that she went two days without eating there . . . .

8

> And then, later on when we get to talking about [M.M.'s] health and her, you know, how she is with her medical stuff or her—any medical conditions. [M.M.] said that she has low blood sugar, and if she doesn't eat something every day that she will faint.
>
> And so, I asked [M.M.], "Have you fainted within this last year?" And she said, "No, I've never fainted. I've had something to eat every day." So, that was—you know, I asked her what about those two days that you said you went without eating. And so, [M.M.] wasn't really able to provide an answer for that.

Garza also noted that M.M. mentioned that A.C.T.M. had a fever six months before they crossed and that she had taken A.C.T.M. to a doctor in Mexico but could not provide records, the name of the doctor, the location of the clinic, or a description of the building's appearance. Garza later on received a copy of an immunization record from M.M., but Garza noted she "could[ no]t use it" because it was handwritten, from Mexico, and "the doctors did not accept it because it appeared altered."

Garza testified that M.M. denied experimenting with any drugs, and stated that she and A.C.T.M. were in the same room where somebody was smoking marijuana. M.M. also mentioned that Sandoval would often take care of A.C.T.M. alone. M.M. admitted to having domestic violence issues with him and mentioned that she ended that relationship three days before receiving the call to go to the pueblo, but that she had still lived with him at the apartment in Reynosa at the time. M.M. specifically stated that she left because of the call and "had it not been for that call she would have still been in that relationship with [Sandoval] or stayed in that situation." When asked why she would allow Sandoval to be alone with A.C.T.M. if he was physically abusive, Garza testified that M.M. stated, "that's just how it was" and that he would often "go from happy to mad; mad to happy."

9

In regard to her stay with the coyotes, M.M. stated she was not held there by force or against her will and that she was free to leave at any time. M.M. also stated she could have sought medical attention for A.C.T.M. at the pueblo, but she stayed there because she wanted to cross and she and her family had already paid the payment for crossing the river.

Garza also had a family group conference with M.M., M.M.'s father and stepmother, and Guerra. During the meeting, the reasons for A.C.T.M.'s removal were discussed, and M.M. said she understood the reasons for removal. However, according to Garza, M.M. did not agree with the reasons because she felt that A.C.T.M. was fine, "that she didn't really see anything wrong with [A.C.T.M.], and the grandparents stated the same thing."

Regarding M.M.'s court-ordered service plan, Garza testified that M.M. had completed her services, including a substance abuse assessment with recommended treatment and a psychosocial evaluation. However, Garza noted that M.M. missed a few drug tests and family counseling sessions. Garza also explained that in the course of her employment, she meets face-to-face with clients at least once a month, and M.M. had "not made herself available" for the months of May, June, and July of 2021 despite Garza's efforts to call M.M., text her, and arrive unannounced to her residence three or four times a month. Despite M.M.'s completion of her services, Garza explained that "Part of what we . . . talk about with parents throughout the case is not just attending your services, but actually demonstrating what you've learned, demonstrating positive behavioral change[.] [T]hat was lacking throughout the entire case." Garza elaborated

that the Department's concerns regarded M.M.'s parenting skills.

Garza specifically noted that M.M. had stated that she did not feel she had a normal bond with her child, that there was an "emotional type of separation." On the day that A.C.T.M. was discharged from the hospital, M.M. stated she did not feel that anything was wrong with A.C.T.M., that "it was probably just hereditary, and [A.C.T.M.] being [sic] skinny." Garza was concerned about this statement, and in response explained to M.M., "this is not [A.C.T.M.'s] natural body frame, this is not her natural physical state, how she's supposed to be." M.M. also expressed concern over whether A.C.T.M.'s foster parents would discipline her because M.M. opined that A.C.T.M. was spoiled, by which Garza explained in response that the attention A.C.T.M. was receiving by the Department and medical staff was because of the circumstances and the trauma A.C.T.M. had experienced.

Garza further testified that a month after A.C.T.M.'s discharge from the hospital, M.M. insisted that A.C.T.M. be potty trained, did not understand why her foster parents were not doing that, and expressed that she did not want to struggle with potty training issues once A.C.T.M. was returned to her. Garza testified that "And, again, I had to explain to her that the medical and emotional traumas that [A.C.T.M.] has been through, that the Department's focus at that point was not on [A.C.T.M.] being potty trained at the time, and that we were focusing on her getting medically and mentally better." Garza told M.M. that the Department's focus was on ensuring that A.C.T.M. no longer needed a G-Tube; was able to walk well; and was able to run. Garza further told M.M. "that potty training would come on its own."

Garza also indicated that a month later, M.M. insisted that A.C.T.M.'s foster mother put A.C.T.M. on a strict sleeping schedule to where she fell asleep at the same time and suggested that the foster mom turn off all lights, put A.C.T.M. in complete darkness, and cover her body and entire face with a blanket. In response, Garza explained that leaving children in darkness like that can trigger emotional traumas in children, that it would not be beneficial to [A.C.T.M.], and that it was against the Department's discipline policies. M.M. also refused to answer a gastroenterologist's questions about A.C.T.M.'s past medical history because M.M. felt "uncomfortable" and "judged," even after Garza assured M.M. that the doctor needed to know such information in order to provide the best medical care possible for A.C.T.M. Though M.M. had access to and completed free online nutrition classes, Garza testified that M.M. was unable to express how to properly feed a child after many months into the case.

Garza also testified regarding the progression of A.C.T.M.'s improvement. A.C.T.M. was initially non-reactive to conversations or medical treatment: "She had no reaction. She would not cry; she would not smile, she would not—even if the nurse came in to, you know, poking, prodding, she had no reaction to anything." Garza explained that over time, A.C.T.M. has become more reactive and talkative. Garza also noted that it was two weeks after January 15, 2020, before A.C.T.M. could stand on her own after daily physical and occupational therapy sessions. A.C.T.M. was barely able to walk upon her discharge from the hospital on February 18, 2020—over one month after being admitted. Despite the Department's numerous requests, M.M. never provided the Department with pictures taken the night before A.C.T.M. was admitted into the hospital demonstrating

12

that A.C.T.M.was running and playing.

In October 2020, Garza performed a home assessment of M.M.'s studio apartment in McAllen. The apartment had a refrigerator and stove, an area for A.C.T.M. to sleep in, and was adequately clean. The apartment did not have heating or cooling, but that was added later. The apartment was not child-proofed and did not have fire extinguishers or smoke detectors, but Garza testified that "all of that eventually was taken care of." During the assessment, "[M.M.] stated that she believed she was the person responsible for [A.C.T.M.'s malnourishment], and how [A.C.T.M.] ended up in the hospital due to not feeding her properly." According to Garza, M.M. "said that it[ i]s because [A.C.T.M.] nearly died, and she was[ no]t safe with her." Garza further explained:

> That was something that she had never said before, because she was always denying any type of, you know, taking responsibility for anything that happened. And she couldn't give a consistent timeline, or why her child was the way that she was. That was just—she didn't go into the details of whether she got fed or not fed. She just said that she knows that it was her fault that she didn't. She wasn't getting the nutrients that she needed.

Furthermore, M.M. indicated to Garza that "had it not been for [A.C.T.M.] not breathing, [M.M.] would not have taken her to a doctor, because she didn't feel her condition that she was in needed a doctor."

Garza expressed the Department did not want to reunite A.C.T.M. with M.M.:

> We have concerns for [A.C.T.M.'s] life and safety, and for being provided— or her to regress to the conditions that she was in. It was a near death for this child. And so, we're just concerned that [M.M.] may not be able to provide a suitable and safe home for her.

Garza further elaborated:

> The Department's concerns are that there hasn't been significant progress to [M.M.'s] knowledge of how to care for a child, and providing her with her

13

needs, her basic needs that any child would need. We're concerned that this child nearly died because of this.

And it's a major concern that should the child go back to a situation where the parent hasn't demonstrated progress, this child's life would be in danger.

Her life was literally almost lost, and so it's just not something that the Department is willing to, you know, put a child in danger knowing that the parent hasn't fully understood, or has lack of knowledge of how to keep this child safe.

On cross-examination, the following colloquy occurred:

[Counsel for M.M.]:     And at this point, you are of the opinion that [M.M.] is not adequately prepared to take care of her child; is that right?

[Garza]:     That's correct.

[Counsel for M.M.]:     Despite having completed all of her services, you feel that she's not prepared?

[Garza]:     That's correct.

[Counsel for M.M.]:     Okay. And despite having a safe home for her child to live in, you still feel like she's not ready?

[Garza]:     That's correct.

[Counsel for M.M.]:     Okay. Now, you feel like perhaps the child would not be safe with her, or would not get her adequate needs with [M.M.]; is that correct?

[Garza]:     That's correct.

In addition, Garza testified that A.C.T.M. was placed in a foster home the same day she was released from the hospital, A.C.T.M. refers to her foster parents as "Mommy and Papi," and that she is attached to them. According to Garza, M.M. has stated that she feels the foster parents "are [A.C.T.M.'s] parents." Garza also testified that A.C.T.M.

14

has had play therapy sessions twice a month since her discharge from the hospital. M.M. was encouraged to participate in the play therapy sessions, but Garza noted that M.M. had only recently started participating in the sessions a month prior to trial.

**D. Dr. Bista**

Dr. Bista, a pediatric critical care physician, testified that on January 1, 2020, three-year-old A.C.T.M. was admitted to ECH, and was severely malnourished and had suffered a cardiac arrest. An emergency room doctor performed chest compressions on A.C.T.M several times because her heart stopped functioning. A breathing tube was provided to A.C.T.M. and she was placed on a mechanical ventilator, a device which breathed for her. Once A.C.T.M.'s heart began functioning properly, she was transferred to the pediatric intensive care unit (PICU).

Dr. Bista attended to A.C.T.M. during her time in the PICU. Dr. Bista treated A.C.T.M. for over a month and observed that A.C.T.M.'s skin was abnormally "laxed" and not as tight as a "normal baby" due to malnourishment. A.C.T.M. also required medication to raise her blood pressure. Dr. Bista could not recall what A.C.T.M.'s weight was. However, when asked whether her weight was "within the one-third percentile of her age group as far as weight [wa]s concerned," Bista replied, "She was less than third percentile." Dr. Bista also observed that A.C.T.M. did not have the amount of muscle mass that he would have expected in an otherwise healthy child her age. When asked if thirteen pounds is within the typical weight for a three-year-old child, Dr. Bista replied, "No," and "It would be higher than that."

15

Dr. Bista testified that there are different causes of malnutrition, including when a person does not eat enough, or when a person eats enough but has an underlying medical condition that causes malnutrition. Lab testing revealed no underlying medical condition which could cause A.C.T.M.'s malnutrition, so Dr. Bista opined that the most likely cause of A.C.T.M.'s malnutrition was that she did not eat enough. Dr. Bista further testified that A.C.T.M. slowly improved over time and that medical staff were able to "slowly decrease the medication to help with [A.C.T.M.'s] heart," "slowly able to decrease her breathing support, and . . . . were able to take [A.C.T.M.] off the mechanical ventilation." After she left the PICU, A.C.T.M. was transferred to pediatric hospitalists and she had surgery for installation of a feeding tube, which was utilized to feed and provide nutrition to A.C.T.M. and enabled her to gain weight. Dr. Bista also noted that A.C.T.M. underwent physical and occupational therapy in order to walk again.

## E.     M.M.

M.M. testified that her stepmother helped her and A.C.T.M. move into a studio apartment in Reynosa, Mexico in February 2019. Prior to moving to Reynosa, M.M. and A.C.T.M. were twice caught crossing the border into the United States. M.M. testified, "Well, we got with the coyotes for the first two times, we were there with them for one day," and "after the first two attempts . . . I got scared, because I had been told that if I got caught another time that I would have to do some years in prison." M.M. explained that once she moved to Reynosa, she received two hundred dollars every three days or weekly from her father and stepmother, who lived in the United States. M.M. stated that "$200 in Mexico . . . [i]s a lot of money" and "that was enough for us two."

16

M.M. began dating Sandoval in April 2019. M.M. testified that at the same time, A.C.T.M. began eating less; however, M.M. admitted she did not know how much A.C.T.M. weighed. Sandoval moved in with M.M. and A.C.T.M. in May 2019, and began hitting both M.M. and A.C.T.M around this time. M.M. explained that she did not alert authorities because she was scared of Sandoval, who worked for the cartel. She further explained that she did not leave because she had no family in Reynosa, had nowhere else to go or stay, and was "still waiting for another call from the coyotes" to try to cross into the United States again. At the same time, A.C.T.M. became a "picky eater" and began eating less. M.M. noticed A.C.T.M. lost weight because her clothes didn't fit her like they used to. M.M. stated she was concerned but still thought A.C.T.M. was okay.

In June 2019, Sandoval still lived at the apartment and remained aggressive towards M.M. and A.C.T.M. Sandoval would punch M.M. with a closed fist and hit A.C.T.M. with an open hand, "kind of slap her," and hit A.C.T.M. with his belt. M.M. stated that she tried to stop Sandoval from hitting A.C.T.M., but Sandoval would turn towards M.M. and start hitting her. The assaults happened "almost every four days, every week," "depending on his mood." M.M. explained that "[s]ometimes, like, he would use a lot of drugs. Like, he would use drugs, and whenever he didn't have drugs or wasn't using them, he would be in a bad mood, and that's when he would snap at us." M.M. admitted to being "terrified for our lives" and if she could, she would have left him.

M.M. also testified that around May or June, she began selling "food plates for school kids" every three days to have extra income. However, she admitted that she had quite a bit of money left over from the money she received from her father and stepmother,

17

and that selling plates was unnecessary to pay the bills. M.M. further admitted that she would leave A.C.T.M. with Sandoval or a neighbor while she sold the food plates, but Sandoval was A.C.T.M.'s typical caretaker. M.M. also noted that at this time, A.C.T.M. grew taller and ate more, but M.M. did not know how much she weighed.

M.M. also testified that Sandoval cut off her contact with her father and stepmother by taking away her phone or listening to her conversations with her stepmother. However, M.M. also stated "sometimes [Sandoval] wouldn't be there for a whole day, and then just get there to sleep, but he was mainly there most of the time" and that she was still able to talk to her father and stepmother if she had to. M.M. also stated that she could have asked her stepmother to find another apartment, but she did not want to explain why she would ask for that. M.M. explained she did not want to tell her stepmother about Sandoval because she was embarrassed "it happened again," as she had previously left A.C.T.M.'s father who also hit her. M.M. testified that she believed her father and stepmother would have been supportive had she told them about Sandoval. When asked if it was more important that her stepmother not know what was happening or more important to protect A.C.T.M., M.M. stated that "[i]t should've been more important to protect my daughter."

In July and August of 2019, Sandoval still resided in the apartment but began spending less time there and was still abusive but not as much as the previous months. M.M. stated A.C.T.M. was eating more "[b]ecause like I said, [Sandoval] wasn't spending that much time with us. So, she was starting to eat a lot more." M.M. agreed that she could have gotten away from Sandoval during the times he was gone.

18

In early September 2019, M.M. received a call from a coyote on a day Sandoval was not there, and "they just left." M.M. took a backpack and expected to travel for one day. M.M. and A.C.T.M. were picked up by coyotes, transported by car to an old, run-down warehouse somewhere near the border, and were taken inside an unsanitary room that contained fifteen to twenty migrants. The room had one dirty mattress, a dirty restroom, and nothing else.

According to M.M., she and A.C.T.M. stayed at the warehouse for four months; from September to December 31, 2019, the day they crossed the border into the United States. She explained that she and A.C.T.M. were given tacos twice a day, every day for the first week at the warehouse. However, over time they were given less and less food. She testified that "they wouldn't feed us for, like, five days. And when they gave us food, they would only give us two times, like just one taco for each one of us, and one bottle of water. And that had to last us for three or four days." M.M. stated, "I was desperate, because if I wasn't receiving enough food, and I felt it on myself, like, I was starting to get worried for my daughter, because if I wasn't receiving enough nutrition, she was younger and she needed more than I did. She wasn't receiving as much as she had to." According to M.M., A.C.T.M. began losing weight in September and appeared as thin as she did at the hospital by November. M.M. stated she planned to take A.C.T.M. to a doctor once she was in the United States. M.M. admitted to being concerned but never told anyone that A.C.T.M. needed more food or sought medical attention.

M.M. further testified that although she could have left the warehouse, she choose not to leave because she had no place to go, did not know where she was, and did not

19

know any person there. M.M. also stated her phone stopped working, so she had no way to communicate with her father and stepmother. Specifically, M.M. stated "they were not holding us there, like, against our will. But if we did want to leave we could've, but we could've gotten arrested." M.M. elaborated that there were police patrol cars that "would circle around the warehouse every once in awhile."

M.M. testified that on December 30, 2019, she and A.C.T.M. left the warehouse and were taken to a house, where they stayed until night time. Then, with the help of two male strangers, they got into an inflatable raft and crossed the river into the United States. According to M.M., it was a cold night and A.C.T.M. was wrapped up in blankets and sweaters. M.M. admitted that A.C.T.M. was "very, very weak, very small" and that it had been two days since she had eaten. M.M. and A.C.T.M. got into a car with some strangers, and they were dropped off at an abandoned store. Thereafter, they got into another vehicle and were dropped off at a meat market. From there, M.M. and A.C.T.M. walked to her stepmother's home, which was a block away. M.M.'s family, including her three sisters, stepbrother, stepsister, and her father and stepmother were there.

According to M.M., around nine in the evening, A.C.T.M. was walking around, playing with toys and a piñata. They stayed up until midnight. M.M. testified that she tried to feed A.C.T.M., but A.C.T.M. did not want to eat. M.M. woke up the next morning because she heard a weird noise. M.M. then checked on A.C.T.M., saw the noise was coming from A.C.T.M. and tried to wake her up. M.M. rubbed alcohol on A.C.T.M. in an effort to wake her up with no success. M.M. then woke up her father and stepmother, and they all rushed A.C.T.M. to the hospital.

20

M.M. explained she felt guilty once A.C.T.M. was at the hospital: "I feel so guilty, because I feel like it's all my fault. If I hadn't been—maybe I was being too selfish, wanting something better for us, that I didn't pay much attention to what was happening around us, and I let this all happen." However, M.M. also testified that, but for A.C.T.M.'s breathing problem, she might have not taken her to the hospital that day. M.M. stated she "kind of knew" that A.C.T.M. was "not fine, that she had to go to the doctor soon" on the evening they arrived at her father and stepmother's home but explained why she did not take A.C.T.M. to the hospital the moment she crossed the border:

> Because I was scared, because we had just crossed. I was scared. Like, we just crossed, and I am an illegal here. What if I take her to the doctor, and they tell me that—I just crossed. What if they instantly—not instantly, but what if they send me back when I had barely—when we had barely crossed.

M.M. testified she visited A.C.T.M. in the hospital every day and attended every visitation with A.C.T.M. once A.C.T.M. left the hospital until March 2020, "when COVID started" and she could no longer visit A.C.T.M. in person. Visitations changed from in-person to video call due to COVID, and M.M. testified she still did the video calls up to the time of her testimony. M.M. also explained that she had to do services, including classes on parenting skills, which she completed. M.M. requested extra courses on parenting skills and completed those. M.M. also completed nutrition courses online as suggested by her case worker and learned a lot about nutrition. M.M. moved into a studio apartment in McAllen, lived by herself and has a toddler bed for A.C.T.M. Furthermore, M.M. fixed all the safety concerns the Department had with the apartment. At the time of her testimony, M.M. had been living in the McAllen apartment for a year but stated she did

not know the address. M.M. also works at a used clothing warehouse. M.M. testified she did not want to lose her daughter and that she had learned "a lot of stuff regarding taking care of my daughter, her nutrition, everything."

## F. Guerra

Guerra, A.C.T.M.'s court-appointed guardian ad litem, testified that she had been involved in the case since the beginning. Guerra noted that at the time of her testimony, A.C.T.M. was about five years old, no longer had a feeding tube, and had gained considerable weight. According to Guerra, A.C.T.M. is "now at a normal weight for a child her age." Guerra testified that she had met with A.C.T.M. and her foster mother various times through video-conference. Guerra further testified that, based on her observations, A.C.T.M. was thriving "in all aspects." When asked whether A.C.T.M. appeared to be emotionally thriving, Guerra responded "at this point, although she is more talkative now, she does not really communicate that much verbally. But, yes, she is thriving." Guerra testified that A.C.T.M. resides with her foster mother and had been in this foster placement since her release from the hospital.

Guerra noted that A.C.T.M. was not mobile during her stay at the hospital from January 1 to her release in February. Specifically, Guerra stated:

> She had to be moved by hospital staff. At most she would maybe move her head or her arm, but she was not mobile. And I learned also that she—there's no way that she could have been mobile on her feet or legs. She didn't have the muscle strength.

Guerra opined that the parental rights of M.M. should be terminated and that termination would be in A.C.T.M.'s best interest. Guerra explained why she recommended termination despite acknowledging that M.M. had completed her services

22

and M.M.'s testimony that she had learned a lot through the services:

> Well, first of all, the incidences of failure to protect the child occurred, and they were not small incidences. They were large, major incidences. One being leaving the child in the hands of a physical abuser. Two, placing herself voluntarily in the hands of, quote, unquote, coyotes waiting to cross the river. Three, crossing the river in itself was dangerous. So, I mean, those dangers existed, and they are real. And those dangers cannot be taken away. They are violations of failure to protect the child. They occurred, and nothing can take them away.

> Secondly, while she attended all of her services and did everything she was supposed to by the Court except for the most recent of, I think, taking some drug testing and making herself and her home available to the worker, to Ms. Garza, I've not seen any recommendation by any professional recommending reunification. I think that these incidences, these violations of failure to protect, they occurred, and they were major and nothing can undo that no matter what. They were very serious. So . . . those were the two main reasons.

> Thirdly, was a minimization of the child's condition, in that she was running around and frolicking around.

> . . . .

> [T]o say that this was a normal child running around . . . the evening before she went into the hospital, that doesn't make sense to me. So, again, there's this minimization, not just by her, but by her stepmother and father— well, mostly her stepmother who has been the most verbal of the people surrounding her. A minimization of her seriousness when she came into the hospital, leads me to believe that there is a misunderstanding of what's normal and not normal, and what is healthy and not healthy. So, those are the main reasons.

Guerra also questioned the validity of M.M.'s testimony regarding the length of her stay in the coyote camp. Guerra explained that she had a lot of experience representing smugglers and people who harbor undocumented aliens, but she testified that she had never heard of someone staying in a coyote camp for four months. Guerra testified that she "saw no testimony that [M.M.] was being kept there by gunpoint or anything" and that

23

"[M.M.] should have done something to make sure the child was getting enough food in her belly," and M.M. should have removed A.C.T.M. from the camp. Guerra also acknowledged that M.M. had been consistent with her visits with A.C.T.M., was present at every hearing, and had her own apartment, all of which Guerra agreed were positive factors. However, Guerra testified that termination was still warranted in this case.

### III.    TERMINATION OF M.M.'S PARENTAL RIGHTS

On July 14, 2022, the associate judge terminated M.M.'s parental rights.[4] M.M. timely filed a request for a de novo hearing before the referring trial court. *See id.* § 201.015. Upon conducting its de novo hearing on October 24, 2022, the trial court considered the record of the bench trial before the associate judge. The parties did not present further witnesses. The trial court orally pronounced its ruling terminating M.M.'s parental rights to A.C.T.M.

On January 20, 2023, the trial court rendered its "De Novo Trial Order of Termination," which terminated the parent-child relationship between M.M. and A.C.T.M, and appointed the Department as permanent managing conservator of A.C.T.M. The trial court found two grounds for termination, including that M.M (1) "knowingly placed or knowingly allowed the child to remain in conditions or surroundings which endanger the physical or emotional well-being of the child," *see id.* § 161.001(b)(1)(D); and (2) "engaged in conduct or knowingly placed the child with persons who engaged in conduct which endangers the physical or emotional well-being of the child," *see id.* § 161.001(b)(1)(E).

---

[4] The associate judge's order also terminated the parental rights of A.R.R. and "Unknown Father." A de novo hearing for these decisions by the associate judge was not requested by these men, nor was an appeal filed.

24

The trial court further found that termination of M.M.'s parental rights was in A.C.T.M.'s best interest. *See id.* § 161.001(b)(2). This appeal followed.

## IV.     STATUTORY GROUNDS & BEST INTEREST

By her first issue, M.M. contends the evidence is legally and factually insufficient to support the trial court's termination findings that she violated subsections (D) and (E) of the statutory grounds for termination, as well as the trial court's finding that termination was in A.C.T.M.'s best interest.

### A.     Standard of Review & Applicable Law

"Involuntary termination of parental rights involves fundamental constitutional rights and divests the parent and child of all legal rights, privileges, duties, and powers normally existing between them, except for the child's right to inherit from the parent." *In re L.J.N.*, 329 S.W.3d 667, 671 (Tex. App.—Corpus Christi–Edinburg 2010, no pet.) (first citing *Holick v. Smith*, 685 S.W.2d 18, 20 (Tex. 1985); and then citing *In re D.S.P.*, 210 S.W.3d 776, 778 (Tex. App.—Corpus Christi–Edinburg 2006, no pet.)). Therefore, termination of the parent-child relationship must be supported by clear and convincing evidence. TEX. FAM. CODE ANN. § 161.001(b); *In re J.L.*, 163 S.W.3d 79, 84 (Tex. 2005). Before terminating the parent-child relationship, the trial court must find by clear and convincing evidence that the parent committed one of the acts prohibited by § 161.001(b)(1) of the Texas Family Code and that termination is in the child's best interest. *See* TEX. FAM. CODE ANN. § 161.001(b)(1), (b)(2); *In re J.L.*, 163 S.W.3d at 84.

The "clear and convincing" intermediate standard falls between the preponderance of the evidence standard of civil proceedings and the reasonable doubt standard of

criminal proceedings. *Porter v. Tex. Dep't of Protective & Regul. Servs.*, 105 S.W.3d 52, 57 (Tex. App.—Corpus Christi–Edinburg 2003, no pet.). It is "the measure or degree of proof that will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established." Tex. Fam. Code Ann. § 101.007; *In re J.F.C.*, 96 S.W.3d 256, 264 (Tex. 2002). In our legal sufficiency analysis, we must view the evidence in the light most favorable to the finding, we "must assume that the factfinder resolved disputed facts in favor of its finding if a reasonable factfinder could do so," and we "should disregard all evidence that a reasonable factfinder could have disbelieved or found to have been incredible." *In re J.P.B.*, 180 S.W.3d 570, 573 (Tex. 2005) (per curiam) (quoting *In re J.F.C.*, 96 S.W.3d at 266). However, this does not mean that we must disregard all evidence that does not support the finding. *In re J.F.C.*, 96 S.W.3d at 266. Because of the heightened standard, we must also be mindful of any undisputed evidence contrary to the finding and consider that evidence in our analysis. *Id.* If we determine that no reasonable trier of fact could form a firm belief or conviction that the matter that must be proven is true, we must hold the evidence to be legally insufficient and render judgment in favor of the parent. *Id.*

In a factual sufficiency review, "[w]e must determine whether, on the entire record, a fact-finder could reasonably form a firm conviction or belief that the parent violated a provision of [§] 161.001[(b)](1) and that the termination of the parent's parental rights would be in the best interest of the child." *In re M.C.T.*, 250 S.W.3d 161, 168 (Tex. App.—Fort Worth 2008, no pet.) (citing *In re C.H.*, 89 S.W.3d 17, 28 (Tex. 2002)). Under this standard, we consider whether the "disputed evidence is such that a reasonable factfinder

26

could not have resolved that disputed evidence in favor of its finding." *In re J.F.C.*, 96 S.W.3d at 266. If we conclude that "the disputed evidence that a reasonable factfinder could not have credited in favor of the finding is so significant that a factfinder could not reasonably have formed a firm belief or conviction, then the evidence is factually insufficient." *Id.*

A parental rights termination decree must be based on at least one predicate ground. *See In re A.V.*, 113 S.W.3d 355, 362 (Tex. 2003). If multiple predicate grounds are found by the trial court, we may affirm based on any ground specified by the trial court. *In re T.N.F.*, 205 S.W.3d 625, 629 (Tex. App.—Waco 2006, pet. denied). Therefore, to prevail on appeal, a party must challenge the sufficiency of each affirmative finding of the predicate grounds for termination or at a minimum challenge the best interest finding. *In re S.N.*, 272 S.W.3d 45, 49 (Tex. App.—Waco 2008, no pet.). However, if parental rights are terminated pursuant to § 161.001(b)(1)(D) or (E), we must determine whether the evidence supports those findings, even if there are other grounds for termination. *See In re N.G.*, 577 S.W.3d 230, 235 (Tex. 2019) (explaining that "due process . . . requires a heightened standard of review of a trial court's finding under [§] 161.001(b)(1)(D) or (E), even when another ground is sufficient for termination").

Where, as here, findings of fact and conclusions of law are not properly requested and none are filed, the trial court's judgment implies all findings of fact necessary to support it, *Shields Ltd. P'ship v. Bradberry*, 526 S.W.3d 471, 480 (Tex. 2017), and we must affirm the judgment of the trial court if it can be upheld on any legal theory that finds support in the evidence. *In re W.E.R.*, 669 S.W.2d 716, 717 (Tex. 1984).

27

**B.**     **Subsections (D) and (E)**

Subsection 161.001(b)(1)(D) allows termination when the evidence proves by clear and convincing evidence that the parent knowingly placed or knowingly allowed the child to remain in conditions or surroundings which endangered the child's physical or emotional well-being, and § 161.001(b)(1)(E) allows termination if the parent has engaged in conduct or knowingly placed the child with persons who engaged in conduct which endangered the child's physical or emotional well-being. TEX. FAM. CODE ANN. § 161.001(b)(1)(D), (E). Endanger "means to expose to loss or injury, to jeopardize." *In re N.J.H.*, 575 S.W.3d 822, 831 (Tex. App.—Houston [1st Dist.] 2018, pet. denied) (citing *In re M.C.*, 917 S.W.2d 268, 269 (Tex. 1996) (per curiam)). The child need not actually suffer injury; however, endanger "means more than a threat of metaphysical injury or the possible ill effects of a less-than-ideal family environment." *Tex. Dep't of Hum. Servs. v. Boyd*, 727 S.W.2d 531, 533 (Tex. 1987). "Knowingly" requires that "the parent be aware of but disregard" the potentially endangering environment at issue. *See In re E.R.W.*, 528 S.W.3d 251, 264 (Tex. App.—Houston [14th Dist.] 2017, no pet.).

Subsection (D) focuses on the child's living environment and refers to the suitability of the child's living conditions and of the parent's conduct in the home. *In re J.W.*, 645 S.W.3d 726, 749 (Tex. 2022) (quoting TEX. FAM. CODE ANN. § 161.001(b)(1)(D)). It is not necessary, however, that the Department show the child's environment directly threatened or injured the child under Subsection (D). *See In re M.M.*, 584 S.W.3d 885, 889 (Tex. App.—Amarillo 2019, pet. denied). Further, termination under subsection (D) is permitted on the basis of a single act or omission. *See id.* at 889–90; *In re E.M.*, 494

S.W.3d 209, 221–22 (Tex. App.—Waco 2015, pet. denied). Evidence of a child's environment before the Department obtained custody, including the acceptability of the child's living conditions and parental conduct in the home, is subsumed in the endangerment analysis. *See In re J.E.M.M*, 532 S.W.3d 874, 880–81 (Tex. App.—Houston [14th Dist.] 2017, no pet.). "Physical violence in the home leads to an unstable and unpredictable environment for children." *In re O.E.R.*, 573 S.W.3d 896, 905 (Tex. App.—El Paso, 2019 no pet.). "Inappropriate, abusive, or unlawful conduct by persons who live in the child's home or with whom the child is compelled to associate on a regular basis in the home is a part of the 'conditions or surroundings' of the child's home" under subsection (D). *In re M.D.M.*, 579 S.W.3d 744, 764 (Tex. App.—Houston [1st Dist.] 2019, no pet.) (quoting *Jordan v. Dossey*, 325 S.W.3d 700, 721 (Tex. App.—Houston [1st Dist.] 2010, pet. denied)). A parent's decision to continue living with someone who has committed instances of domestic violence may support an endangerment finding under subsection (b)(1)(D). *See In re M.V.*, 343 S.W.3d 543, 547 (Tex. App.—Dallas 2011, no pet.).

Subsection (E) focuses on the parent's involvement in a conscious course of conduct including not only acts but also omissions or failures to act that endanger the child. *In re E.G.*, 643 S.W.3d 236, 252 (Tex. App.—Amarillo 2022, no pet.). The specific danger to the child's well-being may be inferred from the parent's conduct and need not be established as an "independent proposition." *Id.* The failure to provide appropriate medical care for a child may constitute endangering conduct under Subsection (E), even if the parent did not cause the need for the medical treatment. *See In re M.C.*, 917 S.W.2d

29

at 270 (stating "neglect can be just as dangerous to the well-being of a child as direct physical abuse"); *In re J.D.G.*, 570 S.W.3d 839, 852 (Tex. App.—Houston [1st Dist.] 2018, pet. denied) (cleaned up); *see also In re S.H.A.*, 728 S.W.2d 73, 86–87 (Tex. App.—Dallas 1987, writ ref'd n.r.e.) (affirming termination order where child was malnourished and parents failed to seek medical treatment for child). Because the evidence pertaining to subsections 161.001(b)(1)(D) and (E) is interrelated, we will conduct a consolidated review. *See In re E.G.*, 643 S.W.3d at 252 (citing *In re M.R.J.M.*, 280 S.W.3d 494, 503 (Tex. App.—Fort Worth 2009, no pet.)).

M.M.'s testimony established that she and A.C.T.M. endured frequent physical abuse by Sandoval from the time he moved in with them in May 2019 to the time M.M. and A.C.T.M. left the apartment in September 2019. M.M. specifically testified that Sandoval would open-hand slap A.C.T.M. and often hit her with a belt buckle. Cerda observed that A.C.T.M. had half-crescent moon marks on the inside of her thigh, which she testified was indicative of a mark caused by a belt buckle. M.M. admitted that the mark was done by Sandoval. In addition, M.M. testified that Sandoval's physical assaults of A.C.T.M. happened weekly. *See In re E.M.*, 494 S.W.3d at 222 ("Abusive or violent conduct by a parent or other resident of a child's home may produce an environment that endangers the physical or emotional well-being of a child."). M.M. also indicated that Sandoval often used drugs, and explained that he would "snap" at M.M. and A.C.T.M. when he was not using drugs.

M.M. admitted to not reporting Sandoval to the authorities and chose to stay in the apartment, subjecting herself and A.C.T.M. to continuous physical abuse rather than find

30

another apartment because she was embarrassed to inform her stepmother of the abuse. M.M. also admitted she could have left the apartment. M.M. failed to remove herself and A.C.T.M. from a violent, physically abusive relationship with Sandoval over the course of four months. *See In re I.G.*, 383 S.W.3d 763, 770 (Tex. App.—Amarillo 2012, no pet.) ("A parent's failure to remove himself and his children from a violent relationship endangers the physical or emotional well-being of the children."). Accordingly, the trial court could have reasonably found that M.M. knowingly allowed A.C.T.M. to remain in conditions or surroundings which endangered her physical or emotional well-being. *See* TEX. FAM. CODE ANN. § 161.001(b)(1)(D); *see also In re M.D.M.*, 579 S.W.3d at 764; *In re O.E.R.*, 573 S.W.3d at 905; *In re E.M.*, 494 S.W.3d at 222; *In re M.V.*, 343 S.W.3d at 54.

M.M. also indicated that she sold food plates every three days during the same time period that Sandoval was physically abusing her and A.C.T.M.and would often leave A.C.T.M. solely in his care. When Garza asked M.M. why she would allow Sandoval to be alone with A.C.T.M. if he was physically abusive, M.M. responded "that's just how it was." Based on this evidence, the trial court could have reasonably found that M.M. knowingly placed A.C.T.M. with a person who engaged in conduct that endangered her physical or emotional well-being. *See* TEX. FAM. CODE ANN. § 161.001(b)(1)(E); *In re E.G.*, 643 S.W.3d at 252.

In addition, M.M. testified that she and A.C.T.M. left her Reynosa apartment and ended up living in a warehouse on September 2019 and remained there until they were smuggled into the United States on December 31, 2019. According to M.M., she and A.C.T.M. stayed with between fifteen and twenty other people in an unsanitary room with

one dirty mattress and a dirty restroom, and food was scarce. M.M. admitted that A.C.T.M. began losing weight in September and appeared as thin as she did at the hospital in November 2019. Other witnesses and photographic evidence established that on January 1, 2020, A.C.T.M. was severely malnourished, weighed thirteen or fourteen pounds, appeared skeletal, and had suffered a cardiac arrest. Dr. Bista opined that the most likely cause of her malnutrition was that she did not eat enough. Furthermore, the evidence demonstrated that A.C.T.M. was barely able to walk upon her discharge from the hospital on February 18, 2020—over one month after being admitted.

M.M. testified that she and A.C.T.M. were free to leave the warehouse but M.M. chose to stay despite increasing food scarcity and A.C.T.M.'s continued weight loss. Although she was concerned regarding A.C.T.M.'s condition, M.M. did nothing to feed A.C.T.M. or request more food. By failing to remove herself and A.C.T.M. from the warehouse where A.C.T.M. was inadequately fed to the point she became severely malnourished and eventually suffered cardiac arrest and became physically immobile, the trial court could have reasonably found that M.M. knowingly allowed A.C.T.M. to remain in conditions or surroundings which endangered A.C.T.M.'s physical or emotional well-being. *See* TEX. FAM. CODE ANN. § 161.001(b)(1)(D); *In re M.D.M.*, 579 S.W.3d at 764; *see also In re D.M.*, 452 S.W.3d 462, 469–70 (Tex. App.—San Antonio 2014, no pet.) (holding evidence sufficient to support finding parent placed or allowed child to remain in endangering conditions where home had no food and child appeared hungry); *Phillips v. Tex. Dep't of Protective & Regul. Servs.*, 149 S.W.3d 814, 818–20 (Tex. App.—Eastland 2004, no pet.) (considering evidence that home contained almost no edible food was an

32

endangering condition); *In re A.B.*, 412 S.W.3d 588, 677 (Tex. App.—Fort Worth, 2013 pet. granted), *aff'd*, 437 S.W.3d 498 (Tex. 2014) (holding that evidence supported an inference that father knew of and contributed to his daughter's failure to thrive and, consequently, that father endangered her by underfeeding her and knowingly allowed her to remain in a malnourished condition that endangered her).

Furthermore, M.M. indicated that A.C.T.M. began appearing thin in September but admitted that she did not seek medical attention for A.C.T.M. throughout the duration of their stay in the warehouse. M.M. did not take A.C.T.M. to the hospital immediately after crossing the border on December 31, 2019 despite her testimony that she had planned to do so. Rather, M.M. waited to take A.C.T.M. to the hospital until the next morning when A.C.T.M. was not breathing. Garza testified that M.M. had indicated that "had it not been for [A.C.T.M.] not breathing, [M.M.] would not have taken her to a doctor, because she didn't feel her condition that she was in needed a doctor."

M.M. admitted that she did not take A.C.T.M. to the hospital the moment she crossed into the United States because she was scared and was worried about being immediately deported back to Mexico. Because the evidence demonstrates that M.M. failed to provide appropriate medical care for A.C.T.M., the trial court could have found that M.M. knowingly engaged in conduct that endangered A.C.T.M.'s physical or emotional well-being. *See* TEX. FAM. CODE ANN. § 161.001(b)(1)(E); *see also In re J.D.G.*, 570 S.W.3d at 852; *In re S.H.A.*, 728 S.W.2d at 86–87; *In re M.C.*, 917 S.W.2d at 270.

M.M. argues that there was no evidence that she posed a present or future danger to the child, citing *Wetzel v. Wetzel*, 715 S.W.2d 387 (Tex. App.—Dallas 1986, no writ.).

33

*Wetzel* holds that "acts in the distant past, without showing a present or future danger to a child, cannot be sufficient to terminate parental rights." *Id.* at 391. Here, the acts by which M.M. knowingly allowed A.C.T.M. to remain in conditions or surroundings which endangered her physical or emotional well-being were not in the distant past. *See* TEX. FAM. CODE ANN. § 161.001(b)(1)(D). Likewise, the acts by which M.M. knowingly engaged in conduct that endangered A.C.T.M.'s physical or emotional well-being were also not in the distant past. *See id.* § 161.001(b)(1)(E). *Wetzel* analyzed whether acts done which were at one time sufficient to support termination could still be sufficient to support termination at a proceeding brought four years later. *See* 715 S.W.2d at 390. However, in this case, the acts that support termination occurred between May 2019 to December 31, 2019—a mere seven months before this termination proceeding was initiated by the Department. Therefore, we hold that *Wetzel* is distinguishable from the facts before us. *See id.* In addition, the record contained evidence that M.M. posed a future danger to M.M. In particular, we note that Garza opined that M.M. was not adequately prepared to take care of A.C.T.M. and that A.C.T.M. would not be safe or have her needs met with M.M.

After reviewing all the evidence in the light most favorable to the predicate grounds for termination, we conclude a reasonable factfinder could have formed a firm belief or conviction that M.M. committed the acts described in subsections (D) and (E). We also conclude, based on the entire record, that the disputed evidence that a reasonable factfinder could not have credited in favor of these termination findings is not so significant that a factfinder could not reasonably have formed a firm belief or conviction as to the

truth of these findings under subsections (D) and (E). We therefore hold the evidence is legally and factually sufficient to support the predicate grounds for termination under subsections (D) and (E). *See* TEX. FAM. CODE ANN. § 161.001(b)(1)(D), (E).

## C.    Best Interest

The Department is also required to prove by clear and convincing evidence that termination of M.M.'s parental rights is in the best interest of the child. *See* TEX. FAM. CODE ANN. § 161.001(b)(2); *In re K.M.L.*, 443 S.W.3d 101, 116 (Tex. 2014). There is a "strong presumption" that the best interest of the child will be served by preserving the parent-child relationship. *In re R.R.*, 209 S.W.3d 112, 116 (Tex. 2006) (per curiam). However, the presumption is not unrebuttable; the Texas Family Code and direction from the Supreme Court of Texas provide additional factors for assessing the best interest of a child. *See* TEX. FAM. CODE ANN § 263.307; *Holley v. Adams*, 544 S.W.2d 367, 371–72 (Tex. 1976). Included among these are the following: (A) the desires of the children; (B) the emotional and physical needs of the children now and in the future; (C) the emotional and physical danger to the children now and in the future; (D) the parental abilities of the individuals seeking custody; (E) the programs available to assist these individuals to promote the best interest of the children; (F) the plans for the children by these individuals or by the agency seeking custody; (G) the stability of the home or proposed placement; (H) the acts or omissions of the parent which may indicate that the existing parent-child relationship is not a proper one; and (I) any excuse for the acts or omissions of the parent. *Holley*, 544 S.W.2d at 371–72. The absence of evidence about some of these considerations would not preclude a factfinder from reasonably forming a

strong conviction or belief that termination is in the children's best interest, particularly if the evidence were undisputed that the parental relationship endangered the safety of the children. *In re C.H.*, 89 S.W.3d at 27; *In re A.C.*, 394 S.W.3d 633, 642 (Tex. App.—Houston [1st Dist.] 2012, no pet.).

In addition to the foregoing factors, evidence that supports one or more statutory grounds for termination may also constitute evidence illustrating that termination of parental rights is in the children's best interest. *See In re C.H.*, 89 S.W.3d at 28; *see also In re E.C.R.*, 402 S.W.3d 239, 249–50 (Tex. 2013). A child's need for permanence through the establishment of a "stable, permanent home" has been recognized as the paramount consideration in determining best interest. *In re K.C.*, 219 S.W.3d 924, 931 (Tex. App.—Dallas 2007, no pet.). In making our determination, we may consider "circumstantial evidence, subjective factors, and the totality of the evidence as well as the direct evidence" while measuring a parent's future conduct by his or her past conduct and determine whether termination of parental rights is in the children's best interest. *See In re E.D.*, 419 S.W.3d 615, 620 (Tex. App.—San Antonio 2013, pet. denied); *In re D.J.H.*, 381 S.W.3d 606, 613 (Tex. App.—San Antonio 2012, no pet.) ("[A] fact-finder may infer from past conduct endangering the well-being of a child that similar conduct will recur if the child is returned to the parent.").

Here, the same evidence supporting the trial court's termination findings under subsections (D) and (E) also support the trial court's finding that termination is in the best interest of A.C.T.M., including: (1) M.M.'s failure to remove herself and A.C.T.M. from a violent, physically abusive relationship with Sandoval over the course of four months;

36

(2) M.M.'s act in leaving A.C.T.M. in the care of Sandoval, a person M.M. knew physically abused A.C.T.M., while she sold food plates (3) M.M.'s failure to remove herself and A.C.T.M. from the warehouse in which A.C.T.M. was inadequately fed to the point she became severely malnourished, physically immobile, and suffered cardiac arrest; (4) M.M.'s failure to seek and provide medical care for A.C.T.M. throughout the duration of their stay in the warehouse and upon arrival into Texas. *See Holley*, 544 S.W.2d at 372 (holding that the acts or omissions of the parent which may indicate that the existing parent-child relationship is not a proper one as a factor in ascertaining the best interest of a child); *see also In re E.C.R.*, 402 S.W.3d at 249–50; *In re C.H.*, 89 S.W.3d at 28.

Garza testified that A.C.T.M. refers to her foster parents as "Mommy and Papi" and is attached to them. Furthermore, Garza specifically noted that M.M. had stated at the hospital and afterwards that she did not feel she had a normal bond with A.C.T.M., and that there was an "emotional type of separation." According to Garza, M.M. has stated that she feels the foster parents "are [A.C.T.M.'s] parents." At the time of her testimony, Guerra noted that A.C.T.M. was about five years old, no longer had a feeding tube, and had gained considerable weight. Guerra stated that A.C.T.M. is "now at a normal weight for a child her age." Guerra also testified that she had met with A.C.T.M. and her foster mother various times through video-conference, and that, based on her observations, A.C.T.M. was thriving "in all aspects." Thus, the evidence demonstrates that A.C.T.M. has bonded with her foster parents, who are providing for her needs. *See In re S.R.*, 452 S.W.3d 351,369 (Tex. App.—Houston [14th Dist.], 2014 pet. denied) ("[W]hen [a child] is too young to express [her] desires, the factfinder may consider whether the [child] has

bonded with the foster family, [is] well-cared for by them, and [has] spent minimal time with the parent.").

Garza also testified regarding the Department's concerns over the possibility of A.C.T.M.'s reunification with M.M.:

[T]here hasn't been significant progress to [M.M.'s] knowledge of how to care for a child, and providing her with her needs, her basic needs that any child would need. We're concerned that this child nearly died because of this.

And it's a major concern that should the child go back to a situation where the parent hasn't demonstrated progress, this child's life would be in danger.

Her life was literally almost lost, and so it's just not something that the Department is willing to, you know, put a child in danger knowing that the parent hasn't fully understood, or has lack of knowledge of how to keep this child safe.

In addition, Garza opined that M.M. was not adequately prepared to take care of A.C.T.M. and that A.C.T.M. would not be safe or have her needs met with M.M. *See Holley*, 544 S.W.2d at 371 (holding that the parental abilities of the individuals seeking custody as a factor in ascertaining the best interest of a child). Regarding reunification, Guerra testified that "I've not seen any recommendation by any professional recommending reunification."

Moreover, according to Garza, M.M. had stated upon A.C.T.M.'s discharge from the hospital that she did not feel anything was wrong with A.C.T.M., that A.C.T.M.'s emaciated stated "was probably just hereditary, and [A.C.T.M.] being [sic] skinny." Furthermore, M.M. appeared to be more concerned with the foster parents' ability to potty train and discipline A.C.T.M. rather than what A.C.T.M. endured, demonstrating M.M.'s developmental immaturity, lack of parental abilities, and indicates an inability to prioritize

38

A.C.T.M.'s recovery from the physical and mental trauma. *See Holley*, 544 S.W.2d at 371–72. M.M. also appeared more concerned with A.C.T.M. being on a "strict sleeping schedule" in complete darkness, and covering her body and entire face with a blanket. Garza testified that leaving children in darkness like that can trigger emotional traumas in children and would not be beneficial to [A.C.T.M.]. The evidence demonstrates M.M.'s lack of understanding of A.C.T.M.'s physical, emotional, and developmental needs. *See id.*

Although there is not evidence of every single *Holley* factor, "not every factor must be proved to find that termination is in the child's best interest." *In re. J.M.G.*, 608 S.W.3d 51, 58 (Tex. App.—San Antonio, 2020 pet. denied). Having reviewed the record and considered all the evidence in the appropriate light, we conclude the trial court could have formed a firm belief or conviction that termination of M.M.'s parental rights was in A.C.T.M.'s best interest. *See* TEX. FAM. CODE ANN. § 161.001(b)(2). We further conclude that factually sufficient evidence supports the trial court's best interest finding. *See* TEX. FAM. CODE ANN. § 161.001(b)(2). We overrule M.M.'s first issue.

## V.    CONSTITUTIONAL RIGHTS

In her second issue, M.M. lodges various constitutional claims which we categorize and address as four sub-issues.

## A.    Evidence Obtained in Violation of M.M.'s Constitutional Rights

In her first sub-issue, M.M. argues that "[t]he majority of the evidence presented at trial was admissions and statements made by [M.M.] and were illegally obtained and should be excluded under the 4th, 5th, and 6th Amendments of the United States

39

Constitution and Article 1 Section 9, 13, and 19 of the Texas Constitution." Within this sub-issue, M.M. also argues that her in-court testimony was also in violation of her rights under the United States Constitution and Texas Constitution. We do not reach the merits of this sub-issue because M.M. failed to preserve error.

To preserve a complaint for review, a party must have presented a timely objection or motion to the trial court stating the specific grounds for the ruling desired. TEX. R. APP. P. 33.1(a)(1)(A). Constitutional claims must be raised below or they are not preserved for appellate review. *In re L.M.I.*, 119 S.W.3d 707, 711 (Tex. 2003) (holding that father whose parental rights were terminated waived due process argument regarding inability to read his affidavit of relinquishment because he did not raise issue in trial court); *Tex. Dep't of Protective & Regul. Servs. v. Sherry*, 46 S.W.3d 857, 861 (Tex. 2001) (holding alleged biological father waived constitutional error even though he did not have notice of hearing in prior paternity proceeding). The rules governing error preservation apply to civil cases involving termination of parental rights. *In re K.A.F.*, 160 S.W.3d 923, 928 (Tex. 2005). "Appellate review of potentially reversible error never presented to a trial court would undermine the Legislature's dual intent to ensure finality in these cases and expedite their resolution." *In re B.L.D.*, 113 S.W.3d 340, 355 (Tex. 2003) (requiring preservation of error in parental termination case satisfies due process); *In re Baby Boy R.*, 191 S.W.3d 916, 921 (Tex. App.—Dallas 2006, pet. denied) (holding that father waived confrontation claims by failing to raise issue in parental termination proceeding).

Here, the record demonstrates that M.M. did not object to the admission of any of her own out-of-court statements or her in-court testimony based on any of the alleged

violations of the United States Constitution or Texas Constitution. Thus, M.M.'s complaints are not preserved. *See* TEX. R. APP. P. 33.1(a)(1)(A); *In re L.M.I.*, 119 S.W.3d at 711. We overrule this sub-issue.

## B. Temporary Orders Continuing the Department's Appointment as Managing Conservator

In her second sub-issue, M.M. claims that A.C.T.M. was seized in violation of the Fourth Amendment of the United States Constitution. In this sub-issue, M.M. argues that the Department failed to show that A.C.T.M. was in danger *after* being discharged from the hospital, and that A.C.T.M. should have been released back to M.M. at that time. We construe M.M.'s second sub-issue as a challenge to the associate judge's orders continuing the Department's appointment as A.C.T.M.'s temporary managing conservator following its initial removal order on January 7, 2020.

Chapter 262 of the family code sets forth the procedures and substantive requirements for the Department to take possession of a child when necessary to protect that child's health and safety. *In re J.M.*, 549 S.W.3d 330, 332–33 (Tex. App.—Texarkana 2018, no pet.). Under this chapter, the Department is granted authority in urgent circumstances to remove a child from his or her home without prior notice to the parents. *See* TEX. FAM. CODE ANN. §§ 262.101, 262.104. This emergency authority is subject to judicial oversight. *See id.* §§ 262.102, 262.106–.107.

Pursuant to § 262.102, "a court may, without prior notice and a hearing, issue a temporary order for the conservatorship of a child under [§] 105.001(a)(1) or a temporary restraining order or attachment of a child authorizing a governmental entity to take possession of a child in a suit brought by a governmental entity," provided that the trial

41

court finds:

> (1) there is an immediate danger to the physical health or safety of the child or the child has been a victim of neglect or sexual abuse;
>
> (2) continuation in the home would be contrary to the child's welfare;
>
> (3) there is no time, consistent with the physical health or safety of the child and the nature of the emergency, for a full adversary hearing under Subchapter C; and
>
> (4) reasonable efforts, consistent with the circumstances and providing for the safety of the child, were made to prevent or eliminate the need for removal of the child.

*Id.* § 262.102. Following the issuance of an emergency removal order without prior notice or hearing, a full adversarial hearing must be held "not later than the 14th day after the date the child was taken into possession by the governmental entity, unless the court grants an extension." *Id.* § 262.201.

The provision additionally mandates the child's return to the parent "unless" the evidence adduced at a full adversary hearing suffices to "satisfy a person of ordinary prudence and caution" that, among other things, "the urgent need for protection required the immediate removal of the child and reasonable efforts, consistent with circumstances and providing for the safety of the child, were made to eliminate or prevent the child's removal." *Id.* § 262.201(g)(2); *see In re Tex. Dep't of Fam. & Protective Servs.*, 255 S.W.3d 613, 615 (Tex. 2008) (orig. proceeding) (per curiam); *In re M.N.M.*, 524 S.W.3d 396, 402 (Tex. App.—Houston [14th Dist.] 2017, orig. proceeding).The adversary hearing affords parents the opportunity to present evidence on their own behalf, hear and challenge the Department's evidence, and contest the Department's right to maintain possession of their children. *In re E.D.L.*, 105 S.W.3d 679, 688 (Tex. App.—Fort Worth

42

2003, pet. denied).

A parent may challenge the trial court's removal order through a mandamus proceeding. *See In re Tex. Dep't of Fam. & Protective Servs.*, 255 S.W.3d at 615. Once a trial court renders a final judgment, any issue concerning its earlier removal orders becomes moot. *See id.*; *In re E.R.W.*, 528 S.W.3d 251, 257 (Tex. App.—Houston [14th Dist.] 2017, no pet.) ("Because the trial court since has rendered a final judgment, Mother's complaints about the temporary orders authorizing emergency removal are moot."); *In re A.K.*, 487 S.W.3d 679, 683 (Tex. App.—San Antonio 2016, no pet.) ("[A] temporary order is superseded by entry of a final order of termination, rendering moot any complaint about the temporary order."); *In re J.D.S.*, 494 S.W.3d 387, 389 (Tex. App.—Waco 2015, no pet.) (finding that the "trial court's decision to allow the Department to maintain custody of a child following an adversary hearing is reviewable, if at all, through a petition for writ of mandamus"); *see also In re B.U.H.*, No. 13-18-00622-CV, 2020 WL 7074358, at *7 (Tex. App.—Corpus Christi–Edinburg Dec. 3, 2020, no pet.) (mem. op.) ("[A]ny complaint about the temporary orders is now moot."); *In re A.H.*, No. 09-19-00025-CV, 2019 WL 2220306, at *3 (Tex. App.—Beaumont May 23, 2019, pet. denied) (mem. op.) (finding that complaints on direct appeal regarding the temporary order authorizing the removal of the children are moot).

M.M. could have challenged the complained-of orders under § 262 of the family code through a mandamus proceeding. *See In re J.D.S.*, 494 S.W.3d at 389; *see also In re M.N.M.*, 524 S.W.3d at 398–402 (granting mandamus relief as to trial court's decision to allow the Department to maintain custody of child following an adversary hearing).

43

However, M.M. did not challenge the complained-of orders by mandamus, and the trial court issued its final order of termination. Thus, any complaint regarding the sufficiency of the evidence supporting the complained-of orders now on appeal is moot. *See In re Tex. Dep't of Fam. & Protective Servs.*, 255 S.W.3d at 615; *In re E.R.W.*, 528 S.W.3d at 257; *see also In re B.U.H.*, 2020 WL 7074358, at *7; *In re A.H.*, 2019 WL 2220306, at *3. We overrule M.M.'s second sub-issue.

## C. Petition for Parental Termination

In her third sub-issue, M.M. claims that the State's original petition[5] for removal failed to specify what acts, conduct, or omissions the State was relying on to terminate her parental rights. According to M.M., "the pleadings in this case violate the Due Process Clauses and Due Course of Law provisions of the United States and Texas Constitutions in that the terms used were unconstitutionally void for vagueness."

"Texas follows a 'fair notice' standard for pleading, which looks to whether the opposing party can ascertain from the pleading the nature and basic issues of the controversy and what testimony will be relevant." *Horizon/CMS Healthcare Corp. v. Auld*, 34 S.W.3d 887, 896 (Tex. 2000). "A petition for the termination of the parent-child relationship is sufficient without the necessity of specifying the underlying facts if the petition alleges in the statutory language the ground for the termination and that termination is in the best interest of the child." TEX. FAM. CODE ANN. § 161.101(a). There is no record indication that M.M. specially excepted to any of the Department's pleadings—original or amended versions—and received an adverse ruling. M.M. may not

---

[5] M.M. does not raise any challenge to the live petition involved in this case, the Department's second amended petition.

44

now challenge the sufficiency of the Department's live petition for the first time on appeal. *See In re N.R.T.*, 338 S.W.3d 667, 672 (Tex. App.—Amarillo 2011, no pet.) (citing to *Tullis v. Georgia–Pacific Corp.*, 45 S.W.3d 118, 124 (Tex. App.—Fort Worth 2000, no pet.)); *see also* TEX. R. APP. P. 33.1(a); TEX. R. CIV. P. 90. We overrule M.M.'s third sub-issue.

## D.    Trial Court's Order Terminating M.M.'s Parental Rights

In her fourth sub-issue, M.M. argues that the trial court's order terminating her parental rights consisted of "conclus[ory] findings and gave no real analysis as to what the Court based its findings on." M.M. further argues that her "Due Process and Due Course of Law rights were violated in that while the legal grounds and best interest verdicts were rendered, there was only speculative evidence presented and no analysis or application of how the [Department] met its burden." We construe M.M.'s argument as a challenge to the trial court's failure to issue findings of fact and conclusions of law.

"In any case tried in the district or county court without a jury, any party may request the court to state in writing its findings of fact and conclusions of law." TEX. R. CIV. P. 296. "The court shall file its findings of fact and conclusions of law within twenty days after a timely request is filed." *Id.* R. 297. Because the duty to file findings and conclusions is mandatory, a trial court's failure to do so upon proper request is "presumed harmful" unless "the record before [the] appellate court affirmatively shows that the complaining party has suffered no injury." *Cherne Indus., Inc. v. Magallanes*, 763 S.W.2d 768, 772 (Tex. 1989); *see Tenery v. Tenery*, 932 S.W.2d 29, 30 (Tex. 1996) (per curiam). Injury may be present when "the circumstances of the particular case would require an appellant to guess at the reasons for the trial court's decision." *Gen. Elec. Cap. Corp. v. ICO, Inc.*,

45

230 S.W.3d 702, 711 (Tex. App.—Houston [14th Dist.] 2007, pet. denied). However, in this case, the record demonstrates that M.M. did not request the trial court to issue findings of fact and conclusions of law. Thus, M.M. has waived this sub-issue.[6] *See* Tex. R. App. P. 33.1(a)(1).

Even though M.M. has waived this sub-issue, the reasons for the trial court's ruling were fully set forth in the final judgment. In particular, the order set forth the specific statutory grounds upon which termination of M.M.'s parental rights were based. Moreover, the record contains a full transcript of the proceedings, including the bench trial, and M.M. does not argue that the lack of findings and conclusions made her unable to properly present her case in this appeal. *See* Tex. R. App. P. 44.2(a) (providing that, in civil cases, "[n]o judgment may be reversed on appeal on the ground that the trial court made an error of law unless the court of appeals concludes that the error complained of: (1) probably caused the rendition of an improper judgment; or (2) probably prevented the appellant from properly presenting the case to the court of appeals"); *In re J.I.T.P.*, 99 S.W.3d 841, 849 (Tex. App.—Houston [14th Dist.] 2003, no pet.) (holding that appellant was not prevented from properly presenting her case on appeal "[b]ecause there is a complete reporter's record," appellant "was able to fully brief" her evidentiary sufficiency issue, and the court was "able to fully review" that issue). We overrule M.M.'s fourth sub-issue.

---

[6] As we previously mentioned above, where, as here, findings of fact and conclusions of law are not properly requested and none are filed, the trial court's judgment implies all findings of fact necessary to support it, *Shields Ltd. P'ship v. Bradberry*, 526 S.W.3d 471, 480 (Tex. 2017), and we must affirm the judgment of the trial court if it can be upheld on any legal theory that finds support in the evidence. *In re W.E.R.*, 669 S.W.2d 716, 717 (Tex. 1984).

## VI.    CONCLUSION

The trial court's judgment is affirmed.

NORA L. LONGORIA
Justice

Delivered and filed on the
15th day of February, 2024.

47